## COUNTY OF CALEDONIA.

### APRIL TERM, 1847.

[Continued from Volume 19, page 529.]

---

### PRESENT,

Hon. ISAAC F. REDFIELD,
Hon. MILO L. BENNETT,
Hon. DANIEL KELLOGG,     } Assistant Judges.
Hon. CHARLES DAVIS,

---

## ABRAHAM SANBORN *v.* KITTREDGE & MORRILL.

### IN CHANCERY.

If a bill be brought for discovery and relief, and the discovery be made by the answer, the court may retain jurisdiction and grant the relief prayed for, although an action at law might have been sustained for the same cause.

The orator must allege in his bill those facts, upon which he claims title to relief; he cannot recover upon a case different from that alleged.

Where the orator seeks to recover the avails of property, which he claims by virtue of a levy of execution, and he merely alleges in his bill the fact, that the property belonged to his debtor, as whose he caused it to be attached, and the defendant, in his answer, denies, that the property belonged to the debtor, and

Sanborn *v.* Kittredge et al.

alleges with particularity the facts upon which he founds such denial, regularly the orator should, by amendment of the bill, state distinctly the facts upon which he relied, as showing title in the debtor.

An answer in chancery, not responsive to the bill, is not evidence, but must be sustained by proof.

Where personal property sold consisted in part of a quantity of mill logs, which were lying on the ice and banks of a river, to which they had been drawn for the purpose of being floated down to a mill, and no actual possession of the logs was taken by the vendee, but the vendor exercised no farther control over them, and the residue of the property embraced in the sale passed into the possession of the vendee, it was held, that the sale, as to the logs, was valid, without any actual removal, as against a creditor of the vendor, who attached the logs with knowledge of the sale.

Where a debtor makes a fraudulent sale of his property, his creditor, to whom he was indebted at the time, may impeach the validity of the sale, although the particular form of the indebtedness may have been subsequently changed.

Where the property of a debtor has been attached and sold, by process of law, the regularity of the proceedings cannot be impeached by one who claims that the property belonged to another person, as whose he has caused it to be attached and sold. No one but the owner of the property, or some person representing him, can call in question the attachment and sale.

The purchaser of personal property at sheriff's sale acquires thereby no better title to the property, than the debtor had, as whose it is sold.

The owner of personal property, or his creditor, is not prevented from disposing of, or attaching, the property, although it may have been previously attached, as the property of another person, by leaving a copy of a writ of attachment in the town clerk's office.

Where a party is called upon to account for the avails of mill logs, which he has caused to be sawed, he may be allowed for all necessary expenses of sawing and securing the lumber,—but not for repairs made by him upon the saw mill, if it appear that other lumber was sawed there;—the court will not attempt to apportion the benefits resulting from the repairs.

The supreme court does not usually interfere with the decision of the chancellor in respect to costs, in cases where the chancellor has decided to grant the relief asked for by the bill and that decision is affirmed.

APPEAL from the court of chancery. The facts are fully stated in the opinion of the court.

80

Sanborn *v.* Kittredge et al.

*Baylies* and *Cahoon* for orator.

*Paddock* for defendants.

The opinion of the court was delivered by

DAVIS, J. The orator claims in his bill, that he acquired a title to an undivided half of four hundred mill logs, chiefly pine, one large mill chain, and a shingle machine and gearing, in Victory in Essex county and in Bradleyvale in this county, by virtue of an attachment of the property, made on the 24th of April, 1837, followed by a sale thereof on execution on the 14th and 22d of July, 1837, as the property of William S. Goodell, a debtor of the orator. The bill alleges, that Goodell was, at the time of the attachment and sale, the lawful owner of such undivided part of the property; but it does not detail the origin and history of his title. It admits, that the defendants were the owners of the other undivided half, under a transfer in writing from Isaac M. Sanborn to them, dated April 22, 1837, as security for and in payment of certain demands, which they held against Sanborn, and proceeds to state, that the defendants immediately took possession of the whole of the logs, and caused them to be sawed into boards and shingles,—the latter with the aid of the shingle machine,—and that they had disposed of the whole lumber for their own benefit, refusing to account with the orator for his just proportion, after deducting expenses of manufacture, though specially requested so to do previous to the bringing of the bill. The bill prays, that an account may be taken, and for a decree, that the defendants pay to the orator such sum, as in equity may be found justly due for his share in the mill logs, and also for the use of the shingle machine and mill chain, while in the defendants, possession,—or, if the same shall be found to have been nearly or quite worn out by such use, that the defendants be decreed to pay to the orator one half the value thereof.

The defendants have answered severally; but the answer of Kittredge, he not being an active partner, presents no matter of importance, as within his own knowledge. Morrill, in his answer, admits a partnership between the defendants,—alleges a sale of the shingle machine by them to Isaac M. Sanborn and Jacob Sanborn, on condition of full payment of the price by them,—that the former

had paid his half in full, but the latter had only paid in part, so that Goodell had no right or title to it by purchase from Jacob Sanborn, that could be attached,—that the four hundred mill logs were cut and drawn to Moose river by Isaac M. Sanborn and Jacob Sanborn, —that advances in provisions, goods, &c., were made to Jacob Sanborn by the defendants, to enable him to get out the logs, for which advances the defendants were to have a lien on them,—that in the winter of 1837 Jacob Sanborn being indebted to the defendants in $200, Goodell and one R. V. Burt agreed to give their note for the amount,—that at the same time Jacob Sanborn was to transfer to Goodell and Burt his interest in the logs, machine and chain, —that all parties, except Burt, met on a day appointed to execute the necessary papers, which, being prepared, were signed by those present, on the supposition that Burt would sign, when presented to him, and that they were exchanged, not definitively, however, but as escrows,—that Burt afterwards refused to sign the note, or to have anything to do with the trade,—that the defendants, considering Goodell irresponsible, never accepted his note alone in satisfaction of their debt against Jacob Sanborn,—that they gave up to Jacob Sanborn, to be cancelled, Goodell's note, and received the note of their original debtor for the $200 owing by him,—that Goodell never paid to them any part of said sum,—and that this defendant is informed and believes, that Goodell never had any other right or title to the property in question, save that derived from this unexecuted agreement. He proceeds to say, that afterwards, just two days before the attachment made by the orator, the defendants attached all of the same articles, as the proper goods and chattels of Jacob Sanborn, to secure the payment of said note,—and that, having obtained judgment and taken out execution, all of said property was duly levied upon and sold to said Morrill on the 14th of July, 1837, in part satisfaction of said execution. Morrill also sets forth the contract mentioned in the bill, by which Isaac M. Sanborn conveyed his moiety of the property to the defendants,—alleging that the conveyance was not at first absolute, but by way of collateral security for various sums owing by him, but that subsequently, in 1840, the contract was made absolute. This defendant insists in his answer, that neither Goodell, nor the orator's attaching officer, ever took possession of or removed any portion of the property, but

that, on the contrary, the same remained in possession and under the control of Jacob Sanborn, until the time when it was taken and removed by the defendants.

The answers being traversed, testimony was taken by both parties, and exhibits filed, and the cause, having been heard before the chancellor, was referred to a master to take the account between the parties; and, on the coming in of his report, and exceptions by both parties, a final decree passed in favor of the orator, for the sum found due, without costs. Both parties having appealed to this court, and both having filed objections to the decree, it has now been fully argued by counsel.

It is apparent from this statement of the case, that the great question involved is, whether William S. Goodell or Jacob Sanborn is to be regarded as the owner of an undivided half of the property in question in April, 1837, when it was attached by both parties,—by the orator as the property of Goodell, and by the defendants as that of Sanborn. There is no controversy about the other undivided half; it was in Isaac M. Sanborn, pledged, indeed, to the defendants, and ultimately theirs under the pledge. Several other subordinate questions, however, have arisen, which I shall notice, as I proceed.

Although doubts have been suggested, whether, as the subject matter of this bill does not comprise any mutual dealings or matters of contract between the parties, a court of equity has any jurisdiction in this case;—yet we think, though it be true, that an action at law might have been sustained, still, as the bill seeks a discovery in respect to the proceeds of the lumber sold by the defendants, and discovery is made by the answers, there is no reason to doubt, but that this affords a proper subject for adjustment in a court of equity.

The case made by the bill, as suggested by the defendants' counsel, refers the orator's claim solely to the interest of Goodell and the appropriation of it by attachment and sale on execution. If, therefore, it should be determined, that Burt and Goodell acquired no valid title to the property in their purchase from Abraham Sanborn and Jacob Sanborn, who together owned an undivided half, and consequently Goodell acquired nothing by his subsequent purchase from Burt, it would not be competent for the orator to fall back upon his original interest of one fourth, growing out of the fact, that

he was a proprietor to that extent with his father Abraham and brother Isaac M. in the land, on which the timber was cut, and that he contributed his proper share of the expenses of cutting and drawing,—because he has not alleged these circumstances in his bill as a ground of title.

It may be farther objected, that the bill does not profess to trace the origin of Goodell's title.   There is much in the testimony in respect to this, but nothing in the bill.   This merely asserts the ownership of an undivided moiety by him.   Perhaps, without any knowledge that such title would be controverted by the defendants, this general and comprehensive statement may be sufficient.   When that title, however, came to be impeached by the answer of Morrill, which sets forth particularly the grounds of impeachment, it would have been more in accordance with ordinary practice, for the orator, by an amendment, to have brought forward a distinct statement of the grounds of Goodell's title, instead of simply traversing, as he has done, the defendants' answer.   This irregularity is not insisted on by the defendants' counsel, and we are therefore not disposed to attach much importance to it.

As to the question of fact, the answer of Morrill in respect to the consideration and other circumstances attending the purchase by Burt and Goodell cannot be regarded as evidence.   It is, like the bill, a part of the pleadings, to be sustained by proper evidence. The orator has called for no discovery upon this point; and it is scarcely necessary to say, that the allegations of the defendant are entitled to no more consideration, than those of the orator, except so far as they may be directly called for by the latter.   The depositions of Joseph Lawrence, the original source of the interest of all parties, together with those of Isaac M. Sanborn and Jacob Sanborn, assuredly leave little or no room to doubt the fact, that Abraham Sanborn and Jacob Sanborn, in February, 1837, sold and conveyed to Burt and Goodell all their right and interest in three lots of land, two in Victory and one in Bradleyvale, and also in the four hundred mill logs, which had been previously cut on one or more of these lots, and that Jacob Sanborn at the same time sold and conveyed to the same his moiety of the shingle machine, in which Abraham Sanborn had no interest.   The large mill chain was also included in the joint conveyance.   It is true, we are not put in possession of

Sanborn *v.* Kittredge et al.

a clear and distinct statement of the consideration of this purchase. The quitclaim deed mentions no other property, except the three lots of land; the consideration is stated at $1000. The mill logs, machine and chain, being personal property, did not pass with the deed, but appear to have been transferred by parol agreement, without bill of sale, or other writing.

It is stated, that $1000 constituted the entire consideration for the whole, even including the shingle machine, in which Abraham Sanborn had no interest. How this sum was paid, or to be paid, does not appear with much distinctness, except in part. A portion seems to have been paid by taking up notes, which the Sanborns had given to Lawrence, of whom the land was originally purchased, and giving their joint and several notes to him in lieu thereof. A small sum was paid to Judge Paddock; and it is altogether probable, as contended by Morrill, that a debt of $200, which Jacob Sanborn owed to the defendants, was agreed to be paid. If it be true, that they never paid this, and never relieved Jacob Sanborn from it, it by no means follows, that the sale falls to the ground. The defendants were no otherwise parties to the transaction, than that they were willing, and probably anxious, to have Burt and Goodell substituted in the place of Jacob Sanborn, as their debtors. They parted with nothing, to induce the arrangement, and by its failure so far they lost nothing. For some reason, not fully explained, Burt declined signing the note. It may have been on account of an intervening loss by fire of some portion of the property, or because he had relinquished all his interest to Goodell and was about to leave the country. The evidence shows, not merely a regular sale, acquiesced in by all parties as valid and binding, but it proves, that the purchasers took possession of the property; the logs, indeed, were not actually removed from their position on the ice and bank of Moose river; but the purchasers used the chain, shingle machine, saw, &c., and the vendors ceased to have any control over or management of any of the property.

The defendants were apprised of this sale, before they attached. Having taken a note for $200, signed by Goodell, with the understanding that it would also be signed by Burt, but which he declined doing, they came to the resolution, which they had an undoubted right to do, to return the note and look to their original debtor.

They applied to Jacob Sanborn to give them his note, giving up at the same time the Goodell note. He reluctantly consented, being told of their purpose of attaching the logs and other property, which had been sold already. A note was given; but instead of being dated on the day when it was executed, it was ante-dated to the 26th of February, 1837, two days subsequent to the sale to Burt and Goodell. We think, situated as these logs were on the ice of a river and on the land of strangers, and considering the cumbersome character of the property, no actual removal was necessary, to render the sale valid against the creditors of the vendor,—especially if personal notice were carried home to such creditor. The case of *Merritt* v. *Miller*, 13 Vt. 416, substantially establishes such doctrine.

I attach no importance to the circumstance, that the defendants' note, on which they attached, was not in existence until some two months after the sale, and is not dated until two days after,—because it appears satisfactorily, that the same indebtedness existed in another form, previous to such sale.

In opposition to the testimony of the two Sanborns and Lawrence, the defendants adduce no evidence, other than the answer of Morrill,—which, as already remarked, cannot be regarded as evidence. If it could be so regarded, it would not be sufficient to overbalance that testimony, as it does not positively and distinctly state facts inconsistent with it, but relies upon information and belief.

The defendants' counsel have attempted to impeach the regularity of the proceedings of the orator's officer, in making his attachment, principally on the ground, that he did not remove any portion of the property, and did not leave an attested copy of the writ of attachment in the respective town clerk's offices of the towns, within which it was situated. Victory was not then and Bradleyvale is not now an organized town; of course there was no town clerk in either, with whom a copy could be left. A copy was left at the county clerk's office in Essex county; but this was a useless ceremony, as no law then existed, giving the same effect to such proceeding in the case of unorganized towns, which is given to the leaving of a copy in the town clerk's office of an organized town. Counsel have treated this subject, as if it were a contest between rival creditors of the same debtor. The defendants, coming forward merely

as the representatives of the interest of Jacob Sanborn, can have no right to interpose between the orator and his debtor, Goodell. None but the latter, or those representing him, can call in question the attachment and sale. The defendants claim nothimg as creditors of Goodell; they deliberately preferred to hold on to their demand against Jacob Sanborn, rather than receive one to the same amount against Goodell. If, in so doing, they have lost the opportunity of realizing the amount out of this property, it is a misfortune, for which there is no remedy. Had they judged differently, the result might have been, that the orator would have lost a debt equally meritorious, and somewhat larger.

But the defendants' counsel insist farther, that, though it should be determined, that Jacob Sanborn had no interest in the property, to be appropriated by them, yet that, as purchasers at a public sale by an officer on execution, they acquired a valid title to it, against all the world. They regard such sale in the same light as a sale in *market overt* in England. Such a doctrine has occasionally been advanced by counsel in this state, but has, I believe, never received any countenance from this court. It was, if I mistake not, distinctly repudiated in a case not reported, decided in this county at March Term, 1836. I think the name of the case was *Kelsey* v. *Boynton*. In *Cilley* v. *Cushman*, 12 Vt. 494, the court intimate, that they were not prepared to decide the abstract question. See *State* v. *Miller*, 12 Vt. 437. In *Austin* v. *Tilden et al.*, 14 Vt. 325, Ch. J. WILLIAMS remarks, that " it cannot be denied, that the authorities of the courts in Great Britain and New York are against the position, that such a sale (a sale on execution) passes any property to the purchaser, if the judgment debtor had no property in the goods sold,"—and adds, that he should adopt with great reluctance a contrary principle. And it is now the settled doctrine of this court, that a public sale of one man's property on an execution against another cannot have the effect of divesting the real owner of his rights. *Griffith* v. *Fowler*, 18 Vt. 390. A purchaser at such sale, whether with or without knowledge of the circumstances, can acquire no farther or greater interest than that possessed by the debtor. The point was directly decided in *Merritt* v. *Miller*, already cited, where a new trial was granted on account of the exclusion, by the county court, of evidence of a previous purchase by Williams, whose ser-

vant the defendant was, of corn, which the plaintiff, as deputy sheriff, had attached as the property of one Clark, and which he was about to sell on execution against Clark, when the defendant removed it. On principles of public policy the law will not allow the owner to interpose forcibly to rescue his property from a public officer, who is about to seize or sell it under process against a person having no just title to it; but this principle does not interfere with the doctrine now established.

Although the defendants' attachment was prior in point of time to that of the orator, yet, being under process against Jacob Sanborn, who had parted with all his interest in the property, no lien was thereby acquired, as against the real owner, or the orator, standing in his right; and the same remark will apply to the levy and sale on execution. As the property belonged to Goodell, the legal proceedings at the instance of the defendants, the object of which was to effect a transfer of the interest of Sanborn to themselves, could have no effect whatever on the right and interest of Goodell; they remained, as before, subject to his disposition, or that of his creditors. There is no such magic, as the defendants' counsel suppose, in a sheriff's sale, so as to produce a universal transmutation of titles, irrespective of any connection with the process.

As to the supposed reserved right of the defendants in the shingle machine, the weight of evidence is altogether adverse to any such reservation; and if otherwise, we should incline to believe it was fully paid for; especially since the defendants, by attaching and selling it on their execution against Sanborn, have treated it as his property.

The defendants' claim for repairs made on the saw-mill, where the logs were sawed, was properly disallowed. The price paid for sawing, as well as all necessary expenses in getting the logs into the mill, measuring, piling them, and marketing the lumber, were very properly, in the accounting, made a general charge upon the gross proceeds; but, even if it could be shown, that there was no sufficient inducement to make the repairs, except with reference to these four hundred logs, inasmuch as other lumber is shown to have been sawed there, and it would be vain to attempt to apportion the benefits, resulting from the repairs, between the mill owners and the pro-

prietors of these logs, in a satisfactory manner, these expenses were properly disallowed.

In respect to the question of costs, this court does not usually interfere with the decision of the chancellor. For myself, I can see no good reason, why costs should have been denied to the orator, inasmuch as a formal demand was made for an accounting, before the bill was brought,—which was refused on the ground that the orator had no such interest in the property, as would entitle him to an accounting; and this question of right, after a long and expensive litigation, has been determined in favor of the orator. The chancellor, however, saw, in the incompleteness of the evidence tending to establish the sale to Burt and Goodell, reasons, which, in the exercise of his discretion, he deemed sufficient to warrant the defendants in resisting the title derived from that source. Perhaps he was right.

The decree of the chancellor is affirmed. The costs in this court will be allowed to the orator. The case is remitted to the chancellor, where the proper decree will be entered, adding interest, such costs as are allowed, and such time will be fixed for the payment of the sum due, as the chancellor may think proper, and for granting execution.